ORIGINAL

Rev. 11/97

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>BENJAMIN JOSEPH ARONOW | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>10- **10-1115M** |

Complaint for violation of Title 18, United States Code, Section 2422(b)

| NAME OF MAGISTRATE JUDGE<br>HON. PAUL L. ABRAMS | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>May 10, 2010 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about May 10, 2010, defendant Benjamin Joseph Aronow utilized a facility of interstate or foreign commerce to attempt to persuade, induce, or entice a minor to engage in any sexual activity for which any person can be charged with a criminal offense in violation of 18 U.S.C. § 2422(b).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>MARC J. BOTELLO |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT – FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>May 11, 2010 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

JC: jc          REC: DETENTION

## AFFIDAVIT

I, Marc J. Botello, being duly sworn, do hereby depose and state:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed for approximately 22 years.  During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity.  During the investigation of these cases, I have executed and participated in the execution of search and arrest warrants and seized evidence of violations of United States law.  I have completed more than 100 hours of instruction on how computers and the Internet are used by individuals to sexually exploit children.  I currently investigate, among other things, the sexual exploitation of children and child pornography in the Central District of California as part of the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team.  The SAFE Team is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. §§ 2251, et seq.

### II.   PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint charging BENJAMIN JOSEPH ARONOW with violating 18 U.S.C. §2422(b); Attempted Use of Facility of Interstate Commerce

1

to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense.[1]

3.   This affidavit is intended to show that there is sufficient probable cause for the requested criminal complaint and does not purport to set forth all my knowledge of, or investigation into, this matter.

### III.   SHORT SUMMARY

4.   As set forth in detail below, on April 8, 2010, 25-year-old BENJAMIN ARONOW contacted "Megan," whom ARONOW believed to be a 13-year-old girl, in a Yahoo! chatroom.[2]   In his first conversation with Megan, ARONOW asked Megan to be his girlfriend and suggested meeting in person.   Between April 8, 2010, and May 9, 2010, ARONOW and Megan engaged in approximately 15 separate on-line chat conversations.   On May 10, 2010, ARONOW had another conversation with Megan, via the Internet, and arranged to meet her for sex.   On May 10, 2010, ARONOW showed up at the agreed upon meeting location and was arrested.

### IV.   DEFINITIONS AND BACKGROUND INFORMATION

5.   In this affidavit, the terms "minor" and "sexually explicit conduct," as used herein, are defined as set forth in 18 U.S.C. § 2256.

---

[1]   The conduct at issue would support numerous charges including but not limited to, Lewd Act upon a Child Under the Age of 14, California Penal Code, Section 288.

[2]   In truth, "Megan" was an undercover FBI agent.

2

6.   Based on discussions with SAs who have many years of experience investigating child pornography and child exploitation cases, and my own personal knowledge, I have knowledge of the Internet and how it operates.  For example, I know that the Internet is a worldwide computer network that allows communications, information and data to be transmitted from one computer to another across state, national and international boundaries.  Among the ways that individuals who utilize the Internet can communicate with one another is through the use of electronic mail messages ("e-mail") and Instant Messenger messages ("IM").

7.   The term "computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device but does not include an automated typewriter or typesetter, a portable hand held calculator, or some other similar device."

8.   **E-Mail.**   E-mail is an electronic form of communication from one person to one or more persons via the Internet which usually contains typed-written correspondence and may contain audio and visual images.  The physical world equivalent to e-mail

3

is writing a letter on paper to somebody and sending it to them via the U.S. Postal Service.  An e-mail usually contains a message "header" which generally displays the sender's e-mail address, the recipient's e-mail address, and the date and time of the e-mail transmission.  If a sender chooses to do so, he or she can type a subject line into the header.

   9.  **Chat Rooms.**  A chat room is a public area of the Internet that users can visit in order to type messages to one another.  When an Internet user joins a chat room, he or she can view the text that is typed by any of the other participants to the chat.  The physical world equivalent to a chat room would be for a person to stand in a room full of people and shout a message so loudly that everyone in the room can hear it.  Chat rooms usually are named based on a topic of interest and users can choose rooms to enter by searching for chat room names that reflect their particular areas of interest.

   10.  **Instant Messages.**  IMs allow an Internet user to send and receive messages in real time to one specific user (instead of a group of users).  IMs are similar to e-mail except that IMs are sent virtually instantaneously, and both parties to the message are normally logged into the Internet for the purpose of engaging in a real-time communication.  In order to communicate via IMs, users must be logged onto the Internet using a unique "screen name," which must be different from those already in use

4

during the ongoing chat session.

11.  IM conversations also can be called "chat sessions" even though it is a conversation between only two people. Individual users can also transmit photographs or graphic files in real time during an IM chat session.

12.  A user can (although it is not required) be in a chat room and also at the same time send an IM to any other on-line user, including one that is in the same chat room.  The physical world equivalent of this would be if a person is in a room full of people and then leans over to whisper a message in the ear of another individual in the room.  If the message is sent via IM, only the sender and receiver can view the message.

13.  I know from my training and experience, and from conversations with other agents with extensive experience in investigating child exploitation crimes, that it is a common practice for those who attempt to entice a minor to engage in sexual activity via the Internet to utilize e-mail, IMs, and chat room services in committing this crime.

14.  Based on my training and experience, I know that people commonly use abbreviations during IM chatting.  Some examples of these would be: "idk" for the phrase "I don't know;" "brb" for "Be right back;" "k" for "Okay;" and "lol" for "Laughing out loud."  I also know that it is common for people in IM chats to type in incomplete sentences, to misspell words frequently, and

to not use capital letters.  Users also frequently use letters, numbers, punctuation, and/or symbols to create "emoticons" to convey an idea, such as the use of a colon and parenthesis, ":)" to create a "smiley face."  Throughout the IM chat sessions described below, some of these abbreviations and emoticons were used.

15.  **Yahoo! Incorporated.**  Based on discussions with SAs who have many years of experience investigating child pornography and child exploitation cases, and my own personal knowledge, I know the following about Yahoo! Incorporated ("Yahoo!"):

a.  Yahoo! is a commercial computer service company located in Sunnyvale, California, that provides services to Internet users that include e-mail, groups, Internet search capability, games, personal ads, chat, instant messaging, and other services.  Many of the services offered by Yahoo! are free to the user.

b.  Users of certain Yahoo! services are required to register with Yahoo! to obtain a Yahoo! ID.  For example, using the "Yahoo! Games" service or using the web features of the "Yahoo! Messenger" services requires a user to sign in using a Yahoo! ID to access those services.  Not all Yahoo! services, however, require a Yahoo! ID.  For example, using Yahoo!'s Internet search engine does not require a Yahoo! ID.

c.  A Yahoo! ID is a unique identifier of a user's

account.  The registration process requires that the user select an ID (sometimes referred to as a screen name, Login Name, or profile), a select password, and voluntarily supply some personal information.  This process is completed on-line by the user. Yahoo! does not verify the information provided by the user, such as their name and address.  In addition, Yahoo! does not require that a user supply a credit card account or other verifiable personal information.  As a result, the name and address provided by the user in their Yahoo! ID may be fictitious.

d.     Up to six "profiles" can be associated with a single Yahoo! ID.  A profile is a user's own web page where they can post information about themselves.  These profiles are also known as aliases and allow the user to appear as someone other than their Yahoo! ID when using certain Yahoo! services.  Yahoo! profile information is supplied by the user and is not verified by Yahoo!.

e.     Other users of the Yahoo! service may be able to view profile information.  A user has the option to list or unlist their profile information, similar to telephone listings.

f.     The Yahoo! Messenger service provides an application that allows users to use their cellular telephones to send and receive IM messages with other Yahoo! Messenger users in the form of short message service, aka "SMS," text messages ("SMS text messages").  This feature allows the Yahoo! Messenger user to log on to Yahoo! Messenger from his or her cell phone and communicate with other Yahoo! Messenger users, even if the user

7

is away from his or her computer.

## V.   PROBABLE CAUSE

For the purposes of this investigation, I, acting in an undercover capacity, created a Yahoo! Messenger profile in the name of "Megan," with a Yahoo! screen name of "beechgrl0916" (hereinafter, "Megan"). All statements made by Megan were written by me in this undercover capacity while logged onto Yahoo! Messenger. All conversations between Megan and ARONOW were recorded on my computer.

### A.   On April 8, 2010, ARONOW Contacted Megan

16.  On April 8, 2010, at approximately 12:35 p.m., I logged onto Yahoo! Messenger service as Megan and joined a chat room created by Yahoo! Inc. entitled "California2" using Megan's screen name.  At approximately 1:09 p.m., an individual using the Yahoo! screen name "aronowb," later identified as BENJAMIN ARONOW, initiated a private IM chat session with Megan.  During this first conversation, ARONOW confirmed his knowledge of Megan's age by asking her, "asl," which I know from my training and experience stands for "age, sex, location."  After Megan replied "13/f/so calif" to indicate a 13-year-old female in Southern California, ARONOW continued to chat with Megan and suggested that they meet in person later that same date.  More specifically, the April 8, 2010, chat included the following:

a.   ARONOW described himself as a 25-year old male from Santa Monica, California.  ARONOW stated, "25 m so cal," and "I'm in Santa Monica."  He asked Megan where she was from,

stating "where in so cal?"  After Megan responded, "near LA," and

"im in santa monica too," ARONOW stated, "I'm Ben and it's a

pleasure to meet you."

      b.   ARONOW asked: "So Megan do you have a pic?"  Megan

responded, "yah..do u."  ARONOW indicated he could not do photo

share and suggested they trade pictures through email, stating:

"Do you want to trade pics by email."  At approximately 1:24 p.m.

ARONOW, using the email address "aronowb@yahoo.com," sent two

pictures of himself to Megan at the email address

"beechgrl1091@yahoo.com," which I had created in my undercover

capacity as part of Megan's Yahoo! profile.  The first picture

ARONOW sent to Megan was of a male, approximately 25 years of

age, with dark hair, wearing a dark blue suit and a red tie.  The

second picture was of the same male, standing with two other

males and a female.

      c.   At approximately 1:27 p.m. Megan sent ARONOW a

photograph which she claimed was a photograph of herself but in

actuality was a photograph of a female officer from the

California Highway Patrol (CHP) who has consented to the use of

this photograph in child exploitation cases, taken at

approximately age 13.  The photograph depicts a young female with

long brown hair wearing a flowered dress.

      d.   ARONOW asked Megan: "so when is your bday?"  After

Megan stated, "in sept ill be 14," ARONOW stated, "cool" and

"December i will be 26."

      e.   ARONOW asked Megan: "what is your age limit on

older guys?" and "what's the oldest guy you will be with." After
Megan asked, "u mean on a date or what," ARONOW answered, "I mean
as a couple?" and "Do you want to be with a 25 year old." ARONOW
then asked: "So Megan will you be my gf?"

      f.   Later in the conversation, ARONOW asked Megan: "So
when do you want to meet?" After Megan indicated she was willing
to meet, ARONOW stated, "I can do it today" and "well i can be at
starbucks in 10 minutes." ARONOW offered to drop Megan off at
her home after the meeting, stating "ok I can drop you of as well
if you want." Megan expressed concern that her neighbors might
see her getting out of ARONOW's vehicle and stated, "no...cuz one
of my neighbors mite see me" and "ill get totally busted :(" (sad
face emoticon).

**B.**    **ARONOW'S APRIL 9, 2010 Conversations with Megan**

      18.   On April 9, 2010, at approximately 2:53 p.m., ARONOW
sent Megan an instant message, initiating an on-line
conversation. This conversation included the following:

      a.   ARONOW asked Megan: "So can I ask you something
personal." After Megan responded, "yeah..sure," ARONOW asked,
"Are you a virgin." Megan responded, "um..yah."

      b.   Later the same day, at approximately 5:20 p.m.,
ARONOW sent Megan an instant message, initiating another on-line
conversation. ARONOW asked Megan what she would want to do when
they met, stating "oh ok, so what do you wanna do when we see
each other?" After Megan responded, "idk...up2u," ARONOW asked,
"well are we going to kiss when we see each other."

     c.    ARONOW asked Megan if she would want to go back to his residence, stating "so would you want to go back and chill at my place?" Megan responded, "what about ur mom...wont she like see us." ARONOW stated, "she will not be home on Monday."

     d.    Later in the conversation, ARONOW asked Megan if she had another photograph, stating "Do you have any more pics?" Using the email addresses described earlier, Megan sent ARONOW another photograph she claimed was herself but in actuality was another photograph of the same female CHP officer who has consented to the use of her photographs in child exploitation investigations, taken at approximately age 13. This photograph depicted a young female with long brown hair wearing a black dress. After receiving the photograph, ARONOW stated, "its cool."

     e.    ARONOW continued the conversation with Megan by asking her if she would want to marry him. ARONOW stated, "well do you think I am the rite guy for you and that you will be happy with me for a lifetime." ARONOW later asked Megan what her full name was and Megan responded, "whats ur name." ARONOW stated, "Benjamin Joseph Aronow."

## C.  ARONOW'S April 12, 2010 Conversations with Megan

    19.   On April 12, 2010, at approximately 3:37 p.m., ARONOW sent Megan an instant message, initiating an on-line conversation. This conversation included the following:

     a.    ARONOW discussed meeting Megan on Monday, April 19, 2010, and where they would meet. ARONOW asked Megan, "where

do you feel comfortable about me picking you up." Megan responded, "prob like by blockbuster or like starbucks." ARONOW told Megan he would meet her at the nearby Blockbuster store, stating "Ok I will be standing next to the blockbuster window."

b.    Later the same day, at approximately 5:47 p.m., ARONOW and Megan had another on-line conversation. ARONOW asked Megan how old he was going to be when she turned 15 or 16, stating "how old am I going to be when you 15 or 16?" Megan responded to ARONOW that in two years, when she turns 15, he will be 27, stating "um...like 27 rite?" and "in like 2 years."

**D.    ARONOW'S April 16, 2010 Conversation with Megan**

20.    On April 16, 2010, at approximately 3:36 p.m., Megan sent ARONOW an instant message, initiating an on-line conversation. This conversation included the following:

a.    ARONOW told Megan: "so I got good news and bad news." ARONOW explained: "I start my job on Monday is the good news" and "my tutoring job...math and english...1st, 2nd, and 7th graders." ARONOW advised he would not be able to meet with Megan, stating "but do you want to know the bad news...I can't make it Monday."

**E.    ARONOW'S April 18, 2010 Conversation with Megan**

21.    On April 18, 2010, at approximately 7:45 p.m., ARONOW sent Megan an instant message, initiating an on-line conversation. This conversation included the following:

a.    ARONOW asked Megan to communicate with him on his cellular phone using the SMS text message feature in Yahoo!

Messenger. ARONOW explained: "sms text allows you to be online and it only shows as a text for me" and provided Megan with a cellular telephone number of "3107091196."

**F.   ARONOW'S April 26, 2010 Conversation with Megan**

22.   On April 26, 2010, at approximately 4:34 p.m., ARONOW sent Megan an instant message using his sms text application from the cell phone number 310-709-1196, initiating an on-line conversation. This conversation included the following:

a.   ARONOW asked Megan if she masturbated and how it would feel when he performed oral sex on her. The following is an excerpt from that conversation:

Aronow:   so do you honey

Megan:   do i what?

Megan:   i think you got cut off?

Aronow:   you know pleasure yourself

Megan:   um..i tried it like a couple times..why?

Aronow:   ok cause I am trying to tell how its like

Megan:   what you mean..

Aronow:   Me eating you out

Megan:   you never did that before or what?

Aronow:   I have, but for you its going to feel like your
          fingering yourself I am told.

Megan:   oh..ok

Megan:   it will prob tickle a lot

Aronow:   BJ's for me right

Megan:   huh?

13

Aronow:     when you do oral on me

Megan:      what about that

Aronow:     Your going to do a bj on me

      As the conversation continued, ARONOW continued to ask Megan about performing oral sex on him.  Megan asked if that is what ARONOW wanted her to do.

Aronow:     So is that you would want to do?

Megan:      huh..? want to what

Aronow:     To do a bj on me?

Aronow:     :)

Megan:      i guess i could try that..but what if im not good at it?

Aronow:     How are you not good at it?

Megan:      cuz i never did it before..remember i told you that

Aronow:     Do you know what a bj is?

Megan:      yah...duh!!

Aronow:     Ok, so do you want me to finish in your mouth or on a napkin?

Megan:      prob napkin

      As the conversation continued, ARONOW indicated he would also perform oral sex on Megan, stating "we return the favor for each other" and "If we I ate you out I would make sure you clean done there you get me."  After Megan responded, "clean done?  whats that mean," ARONOW stated, "Like I would not leave any trace that you cummed."

G.   **ARONOW'S April 27, 2010 Conversation with Megan**

23.   On April 27, 2010, at approximately 4:56 p.m., ARONOW sent Megan an instant message, initiating an on-line conversation.  This conversation included the following:

a.   ARONOW asked Megan if she was waiting for Monday. After Megan asked, "whats on Monday," ARONOW stated, "us seeing each other."

b.   ARONOW asked Megan if she was excited about meeting and if she was excited about kissing and engaging in oral sex, stating "so if you can go are you excited."  Megan told ARONOW that she was excited to meet him and that the kissing part was "cool with me."  ARONOW questioned Megan about the other activity they discussed, stating "but the others are not" and "doing more than kissing."  When Megan asked ARONOW what he was talking about, ARONOW stated, "oral sex."  Megan responded that she recalled talking about it and asked where they would do that at.  ARONOW told Megan he would take her back to his place, stating "my place if it was free with no one there."

H.   **ARONOW'S May 3, 2010 Conversation with Megan**

24.   On May 3, 2010, at approximately 7:17 a.m., ARONOW sent Megan an instant message, initiating an on-line conversation. This conversation included the following:

a.   ARONOW asked Megan if she was still planning on meeting him later that day, stating "So are we on for today?" After Megan asked for what, ARONOW responded, "To see each other."

15

b.   ARONOW and Megan discuss meeting later that day at a video store near Megan's residence. ARONOW asked Megan, "ok how long will it take you to get to blockbuster?" After Megan answered, "prob like 10 or 15," ARONOW stated, "ok so then we will meet in the parking lot at 3:30 then and just come straight there."

c.   ARONOW then asked Megan if she would be willing to perform oral sex, stating "Are you comfortable with doing oral or do want to wait a while before we do that?" Megan responded, "idk...its up 2 u." Megan then asked ARONOW if they were going to perform oral on each other, stating "you sed if i was comfortable with oral...did you mean me to you? or you doing stuf to me?" ARONOW responded, "both."

d.   Later in the conversation, ARONOW asked Megan if she wanted to be naked when they had oral sex, stating "If we do oral do you want us to be naked?" After Megan asked ARONOW if he wanted to be, ARONOW stated "Up to you."

I.   **ARONOW'S May 3, 2010 Conversation with Megan**

25.   On May 3, 2010, at approximately 4:20 p.m., Megan sent ARONOW an instant message, initiating an on-line conversation. This conversation included the following:

a.   Megan told ARONOW that she was sorry for not meeting him earlier that day because she had a dentist appointment. ARONOW asked Megan if she wanted him to pick her up at her house, stating "Do you want me to pick you up?" ARONOW advised he had been waiting for her at the video store for an

16

hour, stating "I've been waiting for an hour" and "yeah at blockbuster."

      b.    ARONOW asked Megan where she lived so he could come by and see her.  Megan told ARONOW that she lived in an apartment complex nearby, stating "i live at corner of bundy and iowa..in the apt complex."  ARONOW drove to the area and asked Megan if she could come down to see him, stating "Do you have a balcony on iowa?" and "I can see the balcony from where I am parked."

      c.    ARONOW and Megan discussed meeting another day with ARONOW indicating that Thursdays and Mondays were the best for him, stating, "ok Thursday and mondays, and mondays all the time."

**J.**    **ARONOW'S May 10, 2010 Conversation with Megan**

    26.  On May 10, 2010, at approximately 10:25 a.m., Megan sent ARONOW an instant message, initiating an on-line conversation.  This conversation included the following:

      a.    ARONOW and Megan discussed not meeting the previous week and setting up another meet time.  ARONOW stated, "If you like too we could give it another shot."  After Megan told ARONOW they could just be friends and that she would understand if he did not want to speak to her anymore, ARONOW stated, "No let's give it another chance."

      b.    ARONOW and Megan agreed to meet later that day. ARONOW told Megan he would pick her up at her apartment complex an that he would be parked outside, stating "How about where I

parked next to your house." Megan expressed concern about her
neighbors seeing her get in ARONOW's vehicle, but stated
"yah..thats ok."

        c.   Megan asked ARONOW what they were going to do and
ARONOW stated, "Do what we planned." Megan asked ARONOW if they
were going to have oral sex like they had previous planned,
stating "ok..are we gonna?...you know? the oral stuff at your
house?" ARONOW stated, "if you want too."

        d.   ARONOW and Megan discussed meeting at her house on
South Bundy Avenue in Santa Monica, California, on May 10, 2010,
at 1:45 p.m. At approximately 1:40 p.m., ARONOW asked Megan,
"should I leave now?" Megan asked ARONOW how long it would take
him to get to her apartment. ARONOW responded: "5 minutes" and
"I will be on iowa ok."

**K.   On May 10, 2010, ARONOW Attempted to Meet Megan in Person**

       27.  On May 10, 2010, at approximately 1:30 p.m., several
members of the SAFE Team conducted surveillance in the vicinity
of the 1600 block of South Bundy Avenue, Santa Monica,
California.

        a.   At approximately 1:55 p.m., ARONOW was observed
sitting inside a 2003 gold Nissan Altima with California license
number 5AXE862 parked near the address of 1661 South Bundy
Avenue, Santa Monica, California. Members of the SAFE Team
approached ARONOW as he was sitting in his vehicle, identified
themselves, and placed him under arrest without incident.

**L.     ARONOW's Post-Arrest Statements**

28.  After ARONOW's arrest, I subsequently interviewed ARONOW, who after waiving his Miranda rights, stated the following:

i.    ARONOW confirmed that his screen name was "aronowb," admitted he had been chatting with Megan for several weeks, and acknowledged that ARONOW believed that Megan was 13 years old, turning 14 in September.

ii.   ARONOW admitted that in his chats, he had discussed with Megan meeting her to engage in oral sex with her.

iii.  ARONOW admitted that the location where he was arrested was the location where he was supposed to meet Megan.

iv.   ARONOW admitted that he went to this location with the intention of meeting the person he believed to be Megan, taking her back to his apartment, and engaging in oral sex with her.

v.    ARONOW acknowledged that he knew that it was illegal to have sex with a minor.

29.  At the conclusion of the interview, ARONOW provided law enforcement officers with consent to search his vehicle, which he had driven to the meet location, and his residence located at 2425 Purdue Avenue, Apartment 107, Los Angeles, California, 90064.  The consent authorized agents to seize any items which were determined to be related to this investigation.

a.    ARONOW also provided consent to search an Apple MacBook computer and a Toshiba laptop computer located at his

residence; and a Sprint Blackberry device which was located in his vehicle. I confirmed during the consensual search of the Blackberry that its phone number was 310-709-1196, the number used by ARONOW to send and receive SMS text messages with Megan.

## M.    Identification of ARONOW

30. For each Instant Message conversation between ARONOW and Megan described above, ARONOW used the Yahoo! screen name "aronowb" or the SMS text number of "310-709-1196."

31. On March 27, 2010, I reviewed a California Department of Motor Vehicles ("DMV") report which provided the following information for BENJAMIN ARONOW:

    a.    BENJAMIN ARONOW, born December 17, 1984.

    b.    I also reviewed the photograph on file with the California DMV for BENJAMIN ARONOW. The person depicted in the DMV photograph closely resembled the images sent to Megan during the chat session on April 8, 2010. It also appeared to be the same individual who we arrested.

//

//

//

## VI.   CONCLUSION

32.   Based on the facts set forth herein, and based on my training, education, experience, and participation in this investigation, there is probable cause to believe that BENJAMIN JOSEPH ARONOW has violated 18 U.S.C. § 2422(b): Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense.

_____
MARC J. BOTELLO
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me
this 11th day of MAY.
_____
HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE